Ronald GORDON, Plaintiff,

v.

**Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Conti-Commodity Services, Inc., Conti-Capital Management, Inc., Conti-Capital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., The Board of Trade of the City of Chicago, Acli International Commodity Services, Inc., Litardex Traders, S.A., and John Does Nos. 1 through 15, Defendants.**

No. 82 Civ. 1318 (MEL).

United States District Court,
S.D. New York.

July 19, 1983.

---

Herbert I. Deutsch, P.C., New York City, for plaintiffs; Herbert I. Deutsch, Robert E. Frey, Richard L. Weingarten, Jeanne M. Andersen, Law Student, of counsel.

Sullivan & Cromwell, New York City, for Bache Halsey Stuart Shields Inc. and Bache Group Inc.; Marvin Schwartz, Richard H. Klapper, New York City, of counsel.

Rogers & Wells, New York City, for Merrill Lynch, Pierce, Fenner & Smith, Inc. and ACLI Intern. Commodity Services, Inc.; William L. Glendon, Guy C. Quinlan, Susan Garcia, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for ContiCommodity Services Inc., ContiCapital Management Inc. and ContiCapital Ltd.; Mark H. Alcott, Richard A. Rosen, Peter W. Schneider, Craig Solomon, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Melvin Schnell; Michael Diamond, Erskine D. Henderson, Harold Levy, New York City, of counsel.

Arnold & Porter, Washington, D.C., Gilbert, Segall & Young, New York City, for Banque Populaire Suisse; Alexander Bennett, Brooksley Born, Mark Tuller, Douglas Wald, Washington, D.C., Howard Wilson, New York City, of counsel.

Baer, Marks & Upham, New York City, for Commodity Exchange, Inc.; Barry J. Mandel, Thomas E. Albright, William A. Brandt, Jr., Joshua B. Parker, New York City, of counsel.

Townley & Updike, New York City, Kirkland & Ellis, Chicago, Ill., for Bd. of Trade of the City of Chicago; James K. Leader, Holly S. Stein, New York City, John E. Angle, Chicago, Ill., of counsel.

Seyfarth, Shaw, Fairweather & Geraldson, New York City, Shank, Irwin & Conant, Dallas, Tex., for Nelson Bunker Hunt,

William Herbert Hunt and Lamar Hunt; Daniel S. Greenfeld, Michael L. Hirschfeld, New York City, Roger Goldberg, Roderic G. Steakley, Roger Wolin, Dallas, Tex., of counsel.

Perito, Duerk, Carlson & Pinco, P.C., Washington, D.C., for Intern. Metals Inv. Co., Ltd.; Paul L. Perito, John P. Wintrol, Washington, D.C., of counsel.

LASKER, District Judge.

In this action complaining of manipulation of the silver market, Ronald Gordon moves pursuant to Fed.R.Civ.Pr. 23(b)(3) to certify a plaintiff class. Familiarity with prior decisions in this and related actions is assumed. *See, e.g.,* 551 F.Supp. 509, 552 F.Supp. 332 and 558 F.Supp. 122.

■ Gordon seeks to certify a class of all persons who sold silver futures contracts short on the Commodity Exchange, Inc. ("Comex"), the Board of Trade for the City of Chicago ("CBOT") or the MidAmerica Commodity Exchange, Inc. ("MidAmerica") during the period August 7, 1979 through March 26, 1980, and who suffered a loss as a result thereof, with the exception of the defendants or their families or affiliates (Complaint ¶ 13). Gordon sold silver futures contracts short on Comex during August, 1979 (Complaint ¶ 21).

All of the defendants oppose the motion on the grounds that (1) the proposed class is unmanageable, because it is estimated to contain more than 10,000 members who held numerous contracts, maturing at various times on three different exchanges; (2) there would be substantial conflict between class members as to proof of liability and damages; (3) individual questions of the impact upon and injury to each class member predominate over the common legal and factual questions; and (4) Gordon is an inadequate representative of the proposed class, particularly of plaintiffs who traded after he left the market.

The exchanges, separately, argue that certification is inappropriate as against them because (1) the case of each class member will raise individual factual and legal questions depending on the time at which the class member traded and the actions of the exchanges during that time; and (2) Gordon, who traded only on Comex, is an inadequate representative of plaintiffs who traded on the other exchanges.

### 1. *Manageability*

Defendants argue that a class action composed of 10,000 plaintiffs who traded more than 60 contracts on three exchanges over eight months would be unmanageable. They contend, further, that numerous significant world events occurred over the eight months in question, each of which may have had an effect on the price of silver futures contracts. As to each increase in silver prices, defendants will attempt to prove that it was caused by world events and market forces, while plaintiffs will attempt to prove that it was a result of the defendants' conduct. The product of all the variables, defendants urge, would be an unmanageable case.

Gordon answers that the various complexities recited will not create manageability problems any more complex than those involved in numerous securities or antitrust cases in which classes have been certified. He contends that commodities prices in general and silver futures prices in particular are not volatile, and that, accordingly, it will be relatively simple for plaintiffs to prove that the increases in silver prices over the course of the class period were caused by defendants' conduct and not world events or general market forces. Moreover, Gordon argues that an antitrust plaintiff is not required to prove his damages with certainty, because "[t]he wrongdoer is not entitled to complain that [damages] cannot be measured with ... exactness ..." *quoting Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

The extent to which a case will present management problems cannot be determined with precision, particularly at this early stage of the litigation. For example, whether silver prices are more or less volatile and more or less subject to influence by

extraneous market forces than products involved in other price-fixing cases are questions of fact, resolution of which would be inappropriate at the present time and impossible on the present record.

Putting aside such issues, however, several points stand out. First, to the extent it is possible to do so without creating insuperable managerial problems, there is a substantial judicial interest in the collective adjudication of claims which emanate from a common course of conduct. Thus, in *Greene v. Emersons Ltd.*, 86 F.R.D. 47 (S.D. N.Y.1980), a class was certified where the complaint alleged multiple nondisclosures and misrepresentations over a period of more than three years. It was held that the "different artifices and devices . . . alleged [we]re all in furtherance of 'a single inflationary scheme.'" *Id.* at 58, *quoting Kane Associates v. Clifford*, 80 F.R.D. 402 (E.D.N.Y.1978). Similarly, in *Aboudi v. Daroff*, 65 F.R.D. 388 (S.D.N.Y.1974), the court, finding that a common course of conduct predominated, certified a class where the complaint charged a dozen misleading statements and reports over a period of more than two years. The conduct of the defendants alleged in the complaint appears, on the present record, to constitute a continuing "course of conduct" throughout the class period.

On the other hand, there is no blinking the fact that the complexity of the legal and factual issues presented by the instant action is overwhelming. Twenty-four individuals or entities have been named as defendants (not to mention the 15 "John Doe's"). During the course of the eight months of the proposed class period, numerous events occurred which defendants argue had an effect on the price of silver futures contracts. Moreover, the existence of over 10,000 proposed class members may present managerial problems in terms of identification, notification and calculation of damages. Gordon's argument that his case will be simple to prove does not meet defendants' argument that their defenses will be complex.

Having considered the factors addressed by the parties affecting the manageability of the action, we conclude that the class proposed would be unmanageable, although a class covering a substantially shorter period would be manageable. We note that in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 77 F.R.D. 361 (S.D.N. Y.1977), Judge MacMahon certified a class covering a three-week period in a commodities action presenting similar problems. With respect to the evidentiary complications which may arise from the defense that various world events, as opposed to defendants' conduct, caused the increase in silver prices, such complications cannot be avoided, at least as to the approximately three-week period in which Gordon traded, by denying the motion to certify. The effects, if any, of world events on the price of silver during the period in which Gordon traded will have to be fully proven to defend against his claim regardless whether the case proceeds as an individual or a class action.

Accordingly, unless the factors discussed below indicate to the contrary, it appears appropriate to limit the class to the approximately three-week period during which Gordon traded.

2. *Intraclass Conflicts*

Defendants argue that in order to prevail each class member must prove that defendants' conduct had a greater impact on the price at which he liquidated than it had on the price at which he initially opened his short position. Thus, each plaintiff will be motivated to argue that the price at which he liquidated was highly manipulated, while the price at which he entered the market was relatively unmanipulated. It is contended that, because the various class members entered and left the market at different times, an inevitable conflict will arise among class members as to the impact of the alleged conspiracy at differing dates.

Gordon responds that, because the market price of silver has been steady for nearly one hundred years, the effect of defendants' conduct on the market will be easy to

demonstrate within a reasonable degree of certainty, and that, accordingly, there will be little conflict among class members as to when the effects of the conspiracy were felt by the market. While we are skeptical about the purported ease with which Gordon expects to prove the unmanipulated price level of silver, for the purposes of the present motion it is unnecessary to resolve the dispute, which is essentially one of fact.

■ A proposed class representative is "atypical" of the class under Rule 23(a)(3) and cannot "fairly and adequately protect the interests of the class" under Rule 23(a)(4) if his interests are seriously in conflict with the interests of other class members.[1] However, the existence of minor conflicts does not disqualify a plaintiff from acting as a representative:

> "the circumstance that all class members are not situated precisely the same or even that the class representative may have to select particular weapons from a whole arsenal of arguments does not defeat the cohesiveness of a class devoted to proving common facts and common legal doctrine."

*Professional Adjusting Systems v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 41 (S.D.N.Y.1974) (Gurfein, J.). *See also Kuck v. Berkey Photo, Inc.*, 81 F.R.D. 736, 740 (S.D.N.Y.1979) (Weinfeld, J.) *quoting* 7 Wright & Miller, Federal Practice & Procedure § 1768, at 639 (1972) ("As to . . . adversity of interest, 'only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.'")

Accordingly, the question presented is not whether the conflict described by defendants exists, but whether it "goes to the very subject matter of the litigation" and whether there are means available to control its impact.

A similar problem involving possible intraclass conflict was presented to the Ninth Circuit in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), an action in which at least one of the named plaintiffs was trading at every point in the proposed class period. The named plaintiffs, the court concluded, "will probably represent whatever conflicting interests there are in the development of plaintiffs' trial strategies." *Id.* at 911.

As the *Blackie* court explained, the predominant interest of every class member is to prove the existence of the conspiracy; proof of the amount of damages is secondary. Moreover, it is in the interest of every class member to maximize the extent of the conspiracy's impact at every point in the class period in order to prove the "*sine qua non*—liability." *Id.* at 909–910.

The reasoning of *Blackie* was adopted by Judge Haight in *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 61–62 (S.D.N.Y.1980), an action in which, like *Blackie*, the purchases of the named plaintiffs together spanned the entire purported class period. *Blackie* was also found persuasive by Judge MacMahon in a commodities action in which the purported class period was less than four weeks, *National Super Spuds, Inc. v. New York Mercantile Exchange*, 77 F.R.D. 361, 370–71 (S.D.N.Y.1977).

The *Blackie* rationale nicely balances the factors favoring class treatment against the problems of manageability which inevitably arise in such cases as this. We conclude that while all members of the purported class "are not situated precisely the same," *Professional Adjusting Systems, supra*, their interest in proving the existence of the conspiracy predominates and will predominate over centrifugal or individual interests, and that such conflicts as do arise will be minimized by limiting the class to the period in which the named plaintiff traded. Of course, a finding that common questions predominate does not eliminate potential conflicts. Should intraclass conflicts raise difficulties as the case progresses, the Court retains authority to manage them in accordance with the provisions of Rule 23(a)(4).

---

1. As defendants pointed out at oral argument, if their argument is accepted, *any* proposed representative of this class would suffer a similar defect.

We note that if the conflict postulated by defendants were sufficient to bar class certification for even such limited periods as the approximately three weeks during which Gordon traded, the class action mechanism would be effectively atomized. While defendants' argument is far from capricious, it must be weighed against the other pertinent factors. We conclude that intraclass conflict of the type described above can be controlled if the class period is limited to approximately three weeks, as in *National Super Spuds, supra,* a period in which the named plaintiff was himself trading, as in *Blackie* and *Greene v. Emersons Ltd., supra.*

### 3. *Predominance of Common Questions*

Defendants assert that individual questions predominate over the common questions because the burden on each individual class member to prove that the conspiracy affected him and the extent to which it did so is greater than the common burden to prove the existence of the conspiracy. This argument overlaps, to a degree, the intraclass conflict argument discussed above.

■ To the extent that defendants' position is based on expected difficulties in proving the amount of damages, it is unpersuasive. The rule in this Circuit is that differences among class members which "bear only on the computation of damages .. do[] not justify dismissal of the class action." *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 566 (2d Cir.1968). If individual questions of damages raise serious manageability problems, "the court still has the power at that time to dismiss the class action and permit the plaintiff to proceed only on behalf of himself." *Id. See also Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 37 (S.D.N.Y.1977) (Frankel, J.) *appeal dismissed* 574 F.2d 656 (2d Cir.1978):

> "[D]efendants contend that the question of damages will require individualized proof by absent class members, and that this is in itself sufficient to preclude class treatment. This point proceeds from the familiar proposition that proof of dam-

ages is part of the private antitrust plaintiff's cause of action.... But the conclusion outruns the premise. If defendants' argument were uncritically accepted, there would be little if any place for the class action device in the adjudication of antitrust claims.... The predominance requirement calls only for predominance, not exclusivity, of common questions."

The question remains whether the issue of *causation* of damages, as opposed to the *amount* of damages, invokes individual questions which predominate over the common questions of the existence and effects of the conspiracy as a whole. We think not.

First, the common factual questions of the who, what, when, where, and how of the conspiracy, and the common legal questions of the application of the law, particularly the Commodity Exchange Act, to the facts proven, predominate over the individual questions of whether the conspiracy caused each class member some injury.

Second, there is authority for the proposition urged by Gordon that the jury can be allowed to draw a conclusion that each of the individual class members suffered some injury once the plaintiff class proves both the existence of the conspiracy and that the conspiracy had the overall effect of raising prices:

> "If the appellees establish at the trial for liability that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive price levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee."

*In re Master Key Antitrust Litigation,* 528 F.2d 5, 12 n. 11 (2d Cir.1975) (*dicta*).

Finally, the decision to certify a class is modifiable in the event that the problems predicted by defendants should surface. The district court retains broad powers to manage the class action, through, e.g., dividing the class into subclasses, restricting

certification to certain issues, and, if necessary, decertifying the class. For that reason, and because the motion to certify the class must be made "as soon as practicable after the commencement of the action," Fed.R.Civ.Pr. 23(c)(1), necessarily before the facts have been developed and the issues crystalized, the Court of Appeals has instructed that " 'if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.' " *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), *quoting Esplin v. Hirschi,* 402 F.2d 94 (10th Cir.1968), [*cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969) ].

### 4. *Adequacy of the Proposed Class Representative*

Defendants contend that Gordon is an inadequate class representative because (a) he is unable to defray the costs of class litigation, and (b) he has no incentive to prove the claims of class members who traded after he left the silver market at the end of August. Gordon answers: (a) that although he does not presently have sufficient resources on hand to finance the litigation, his counsel has agreed to advance the funds to him, and he fully understands his obligation to repay counsel whether or not the litigation is successful; and (b) that although he concluded his silver trades in August, he has an incentive to prove the facts which occurred during the remaining seven months of the proposed class period because, in order to make his case convincing to the trier of fact, he will need to prove the entire conspiracy, from beginning to end.

A. Gordon was deposed before the Court on the subject of his adequacy as a class representative. During the course of the deposition, we had an opportunity to evaluate Gordon as he answered questions on the subjects of his understanding of his responsibilities as a class representative, his familiarity with the matters at issue in the litigation, and his assets and potential earning power. We found him straightforward and credible as to his willingness to assume the responsibilities of a class representative, and we were impressed with his clear understanding of the esoteric subject matter of the suit.

■ Rule 23 does not require that a class representative demonstrate a particular net worth or ratio of assets to liabilities. While a showing that a named plaintiff is incapable of assuming his responsibilities would require non-certification, we are satisfied that Gordon's personal skills together with his convincing assurances to see the case through are sufficient to establish his adequacy as a representative.

B. Gordon's adequacy as a representative of class members who traded after he left the market is another matter. We find unconvincing Gordon's argument that he will have sufficient incentive to prove all of the facts and circumstances necessary for recovery by class members who traded after August. While it may be necessary to prove the broad outlines of the conspiracy subsequent to August in order to present a coherent and convincing picture to the jury, it is unrealistic to expect Gordon to have equal incentive to develop all of the intricate facts occurring after August in this exceptionally complex case, once he has proven the existence of a conspiracy in August.[2]

### 5. *The Exchanges' Arguments*

A. The exchanges contend that individual questions predominate because each

---

**2.** In the analogous context of securities actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, a named plaintiff may not prosecute an action against a defendant who traded after the named plaintiff left the market, because the duty of the defendant to disclose or abstain from trading did not arise until the defendant traded, and a plaintiff who traded before the defendant's duty arose was thus not injured by the defendant. *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 559 F.Supp. 800 (S.D.N.Y.1983). *See also Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94–5 (2d Cir.1981) (plaintiff has no standing to sue insider whose trades were not "contemporaneous" with his).

class member's case against the exchanges will differ depending on the action taken by the exchanges during the period that the class member traded. The argument is premature.

On the present record, there does not appear to have been any significant action taken respecting silver by the exchanges during August, the period in which Gordon traded, which is the period that we propose to certify. (See Exchanges' Memorandum of Law at 13–14, listing actions taken by the exchanges, the first of which began in September). In any event, should the facts develop such that a serious conflict arises between class members who traded before or after any pertinent exchange action, the option of subclassing is available.

B. The contention that Gordon, who traded on Comex, is not typical of those class members who traded on CBOT and MidAmerica is more serious. The exchanges are separate organizations, each governed by its own Board of Governors. The exchanges are not alleged to have conspired with each other; thus, proof that one acted improperly would not establish that the other did.

Gordon responds that the market for silver futures is a "unitary" market because "prices are perpetually equalized between and among" Comex, CBOT and MidAmerica. It follows, he argues, that any wrongdoing by one exchange will injure traders on the sister exchanges, and thus, although he did not trade on CBOT, its actions injured him just as if he had.

Whether or not the three exchanges are a "unitary market" as defined by Gordon is not pertinent to the pending motion for class certification. It is undisputed that, whatever their similarities as a matter of fact, as a matter of law the three are distinct entities. Because the three are distinct legal entities, a plaintiff like Gordon who traded only on Comex will face defenses in a suit against CBOT that would not confront a plaintiff who traded on CBOT itself. For example, the exchanges argue that under the Commodity Exchange Act, 7 U.S.C. § 7(d), the governing board of an exchange is required to prevent manipulation on *its* exchange, and thus owes no duty to traders on other exchanges. Similarly, factual difficulties may arise with respect to proving that action by one exchange injured traders on another, injuries which may be too remote to sustain a claim against the second exchange.

Nothing said above is intended to indicate a view as to whether a trader on one exchange can state a claim against another exchange. However, in view of the serious legal and factual problems likely to be encountered in the assertion of such a claim, we conclude that a trader on Comex is not typical of traders on the other exchanges within the meaning of Rule 23.[3]

\*     \*     \*     \*     \*     \*

For the reasons stated above, a class is certified, limited to those persons who sold silver futures contracts short on the Commodity Exchange, Inc. during the period in August, 1979 in which the named plaintiff, Ronald Gordon, traded.

Plaintiff may submit an order on notice, containing the date on which he entered the silver market and the date on which he left.

It is so ordered.

---

3. *Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936, 938 (S.D.N.Y.1981), is inapposite: a motion for class certification was not made and the question of typicality was therefore not considered. Moreover, *Strax* does not set forth a ruling as to whether a trader on one exchange can state a claim against another exchange; it simply allowed a plaintiff to amend his complaint to attempt to set forth adequate allegations against the second exchange.