**In re SUMITOMO COPPER LITIGATION.**

**No. 96 Civ. 4584(MP).**

United States District Court, S.D. New York.

Sept. 18, 1998.

Lovell & Stewart, LLP; Miller, Faucher, Cafferty and Wexler; Lowey, Dannenberg, Bemporid & Selinger, P.C.; Lead Counsel and Chairman of the Executive Committee of Plaintiffs, New York City, for Plaintiffs.

Cadwalader, Wickersham & Taft (by H. Peter Haveles, Jr.), New York City, for Defendant Global Minerals and Metals Corp.

Loeb & Loeb (by Charles H. Miller), New York City, for David Campbell and Bipin Shah.

Paul, Weiss, Rifkind, Wharton & Garrison (by Bruce Birenboim), New York City, for Sumitomo defendants.

Rogers & Wells (by John Carroll and Mark Holland), New York City, for Merrill Lynch defendants.

Katten, Muchin & Zavis (by Arthur W. Hahn), Chicago, IL, for Deft. Morgan, Stanley and Co., Inc.

## OPINION

POLLACK, Senior District Judge.

Plaintiffs, pursuant to Rule 23 of the Federal Rules of Civil Procedure, move for an order certifying this case as a class action. For the reasons set forth herein, the Court will certify the proposed Class.

### Background

This action arises out of the alleged manipulation of prices of copper futures contracts traded on the COMEX division of the New York Mercantile Exchange ("Comex") by the world's largest commercial dealer in copper, Sumitomo Corporation ("Sumitomo"), and a smaller copper dealer, Global Minerals and Metals Corporation ("Global Minerals"), and aided and abetted by various entities of Merrill Lynch Pierce, Fenner & Smith ("Merrill Lynch") and Morgan Stanley & Co., Inc. ("Morgan Stanley"). In their Third Amended Consolidated Class Action Complaint (the "Complaint"), dated June 26, 1998, plaintiffs, who are purchasers and sellers of copper futures contracts on the Comex, allege that, between June 24, 1994 and June 15, 1996 (the "Class Period"), copper futures contract prices rose to artificially high levels by reason of conspiratorial misconduct of defendants. Plaintiffs assert that the artificiality was due to coordinated efforts by Sumitomo and Global Minerals in purchasing a program of copper exchange positions for which they had no need, which they misrepresented to LME and the public to be required by the legitimate commercial needs of their copper businesses.

Plaintiffs claim that the alleged manipulation of copper futures contract prices was accomplished by diverse means, including: building up and holding large long positions in contracts traded on the London Metal Exchange ("LME"), thereby injecting artificial demand and buying pressure into the supply/demand equation for copper exchange contract prices; hoarding the supply of substantially all, or a large portion of, copper for delivery in copper exchange warehouses, thereby artificially restricting supply from the supply/demand equation for copper exchange contract prices; and making false statements to copper market officials and spreading false rumors regarding a commercial need for their massive positions in copper future contracts, thereby facilitating an artificial increase in prices. According to the Complaint, the manipulation ended in June 1996, when Sumitomo, under intense governmental scrutiny, liquidated forward contracts for thousands of tons of unneeded copper. As a result, the prices of copper futures contracts traded on the Comex declined dramatically.

Two separate claims for relief have been asserted by plaintiffs: 1) violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. 18 U.S.C. § 1962(c) and (d), and 2) violation of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2) ("CEA"). In order to merge the like claims of all plaintiffs similarly situated, certification of the case, as against Global Minerals, Bipin Shah, and R. David Campbell (collectively "Global"), as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure has been requested.

### The Proposed Class

For the purposes of this motion, plaintiffs' proposed Class consists of:

> [a]ll persons who purchased Comex copper futures contracts between June 24, 1994 and June 15, 1996, inclusive. Excluded from the class are the defendants herein, any parents, subsidiaries or affiliates thereof, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

Plaintiffs' instant motion for class certification is opposed only by Global.[1] The proposed Class consists of two subclasses:

1) A long subclass, represented by plaintiffs CNA Metals, Inc., Benjamin and Maria Westfried, Hybrid Fund, LP, and Vincent McCrudden, which shall consist of class members who purchased a Comex copper futures contract or contracts as an opening transaction; and

2) A short subclass, represented by plaintiffs Stephen and Judy Carney, Vincent Zuccarelli and Jack Khazzam, which shall consist of class members who purchased a Comex copper futures contract or contracts as a closing transaction.

### Rule 23

On a motion pursuant to Rule 23, a Court will accept the substantive allegations in plaintiffs' complaint as true. *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978). Rules 23(a) and (b)(3) provide that certification is appropriate if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. ...(A)nd in addition: ... (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation. *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208–1209 (2d Cir.1972); *Green v. Wolf Corp.*, 406 F.2d 291, 298, 301 (2d Cir.1968), *cert. denied sub nom. Troster, Singer & Co. v. Green*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green*, 406 F.2d at 298 (*quoting Esplin v. Hirschi*, 402 F.2d 94 (10th Cir.

---

1. The scope of the class relating to the remaining defendants involves separate considerations and will be addressed in a separate application to the Court.

1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969)).

Courts have consistently noted that important public policy benefits arise from class certification in an appropriate case:

> Federal courts have long recognized the suitability of class actions for securities and commodities fraud cases. In cases involving securities or commodities fraud, there are frequently large numbers of investors who have relatively small stakes in the outcomes and who would be deterred from proceeding with lawsuits absent the availability of the class action. In recognition of this policy concern, the courts have developed a body of case law which effectively protects those small investors by making litigation available to them while safeguarding the due process concerns of defendants.

*Waters v. International Precious Metals Corp.*, 172 F.R.D. 479, 486–87 (S.D.Fla.1996) (citations omitted).

Here, plaintiffs and class members are allegedly the victims of defendants' manipulation of copper futures prices. As such, they are persons for whose benefit the CEA was passed. *Leist v. Simplot*, 638 F.2d 283, 304 (2d Cir.1980), *aff'd sub nom., Merrill Lynch Pierce Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Their suit under the CEA, if meritorious, is a valuable supplement in enforcing the CEA. *See Merrill Lynch Pierce Fenner & Smith v. Curran*, 456 U.S. 353, 384–85, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("... Congress viewed private litigation against exchanges as a valuable component of the self-regulation concept.").

### A. *Rule 23(a)(1): Numerosity.*

■ In order to maintain a class under Rule 23(a)(1), the class must be so large that joinder of all members would be impracticable. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992), *cert. dismissed sub nom., Hart Holding Co., Inc. v. Drexel Burnham Lambert Group, Inc.*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Here, the potential class numbers at least 1,500. This number exceeds the amount suggested under the standards of this Circuit and others.[2] Joinder of all members is impracticable.

### B. *Rule 23(a)(2) and Rule 23(b)(3): Predominance of Common Issues.*

■ Rule 23(a)(2) requires the existence of questions of law or fact common to the class. Courts often consider Rule 23(a)(2) in conjunction with Rule 23(b)(3), which requires that common questions predominate over individual questions. *See, e.g., In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206, (S.D.N.Y.1995). "Commonality under Rule 23(a)(2) and Rule 23(b)(3) is established if all class members are in a substantially similar factual situation and the questions of law raised by plaintiffs are applicable to each class member." *Id.*

■ The inquiry required under Rule 23(a)(2) and (b)(3) begins with the elements of the alleged claim for relief, and requires an examination of the proof required to substantiate plaintiffs' allegations. *Kendler v. Federated Dep't Stores, Inc.*, 88 F.R.D. 688, 692 (S.D.N.Y.1981) (to determine whether a "core of identical questions" exists, the Court "must look to the allegations of the complaint and the evidence to be presented in support of the factual allegations of the class"). To prevail on a cause of action for commodities manipulation under the CEA,[3] plaintiffs must establish the following elements: (1) the existence of an artificial price, (2) an intent to cause an artificial price, and (3) causation of

---

2. *See Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir.1972) (stating that in certain circumstances "forty investors have been said to represent a sufficiently large group" for class certification). *See also Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y.1990) (class of approximately thirty-six satisfies numerosity requirement in antitrust conspiracy action).

3. The substantive allegations of plaintiffs' RICO claim and CEA claim are substantially the same. Therefore, it would be duplicative to undertake this analysis for both claims. The elements, participants, and other aspects of plaintiffs' RICO claim have previously been set forth by the Court, and need not be repeated here. *See In re Sumitomo Copper Litig.*, 995 F.Supp. 451 (S.D.N.Y.1998).

the artificial price by the defendants. *See, e.g., Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir.1971), *cert. denied sub nom., Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972) (manipulation is "the creation of an artificial price by planned action, whether by one man or a group of men").[4]

The methods of "manipulation are limited only by the ingenuity of man." *Id.* Accordingly, in enacting the CEA, Congress did not define manipulation by statute; similarly, the CFTC and its many predecessor agencies which have had the authority to promulgate regulations under the CEA, have refrained from defining in an exclusive or other limiting fashion what constitutes manipulation. *See* Jerry W. Markham, *Manipulation of Commodity Futures Prices—The Unprosecutable Crime,* 8 Yale J. Reg. 281, at 461, n. 526 (1991).

In order to recover on the CEA and RICO claims, all class members must initially prove the existence of the same conspiracy; in fact, the existence *vel non* of the alleged conspiracy will likely be the central issue at trial.[5] Plaintiffs plan to present their proofs in two stages, *viz.,* a) initially to develop the existence of the claimed conspiracy to manipulate, and to establish the claimed RICO enterprise and the pattern of racketeering, and then b) to show the damages resulting therefrom. The second phase would address the claim that Comex copper futures prices were distorted due to the conspiracy.

Global contends that plaintiffs must establish that the prices for each of the futures contracts that are the subject of this claim were artificial during all of the trading days involved. Global maintains that if that substantive legal requirement is not susceptible to a common determination, then certification must be denied.

Plaintiffs must establish the existence of an artificial price[6] in order to recover under the CEA or, for that matter, to prove injury under RICO. As the court held in Cargill, "if, despite the fact that it had the power and opportunity to do so, [the defendant] did not in fact cause an artificial price it cannot be guilty of manipulation." 452 F.2d at 1167; *accord In re Soybean Futures Litig.,* 892 F.Supp. 1025, 1053 (N.D.Ill.1995) ("Artificiality is a 'crucial element' of a manipulation claim, without which Defendants cannot be found liable for manipulation, regardless of their 'power and opportunity' to influence prices.").

However, Global overstates the issue as it applies to certification of the proposed Class. The Court is not prepared to conclude, at this early stage, that plaintiffs will ultimately fail to sustain their burden of proving the existence of artificial prices. To the extent that plaintiffs' individual damages may vary depending on the type of trades they were engaged in during the Class Period, that is a matter for determination during the damages phase of trial. As the court noted in *Gordon v. Hunt,* 98 F.R.D. 573, 578 (S.D.N.Y.1983):

[T]he common factual questions of the who, what, when, where, and how of the

---

4. Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2) (as recodified and renumbered; formerly Section 9(b) of the CEA § 13(b)) makes it a felony for "[a]ny person to manipulate or attempt to manipulate the price of any commodity ... for future delivery ... or to corner or attempt to corner any such commodity or knowingly to deliver ... false or misleading or knowingly inaccurate reports concerning ... conditions that ... tend to affect the price of any commodity in interstate commerce...."

5. Conspiracy is an inextricable element in attempting to establish the plaintiffs' RICO claim. Causation and intent are essential elements of a cause of action under the CEA, and the existence of a conspiracy between Sumitomo and Global is probative thereof.

6. "An artificial price is one that does not reflect the market or economic forces of supply and demand." *In re Cox,* Comm. Fut. L. Rep. (CCH) ¶ 23,786, 1987 CFTC LEXIS 325, at *23 (C.F.T.C. July 15, 1987) The finder of fact must therefore evaluate whether the price of a commodity futures contract is reflective of the normal market forces for the underlying commodity or has been distorted by the alleged acts of manipulation. The courts look to a variety of factors in determining artificiality, such as historical price comparisons, an evaluation of supply and demand factors, comparison of spreads, and comparison to the cash market for the commodity at issue. *See Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1167 (8th Cir.1971); *Great Western Food Distrib., Inc. v. Brannan,* 201 F.2d 476, 482 (7th Cir.1953); *In re Cox,* 1987 CFTC LEXIS 325 at *27.

conspiracy, and the common legal questions of the application of the law, particularly the Commodity Exchange Act, to the facts proven, predominate over the individual questions of whether the conspiracy caused each class member some injury. *See Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981) (noting that "[c]ourts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions").

Moreover, plaintiffs have demonstrated to the Court's satisfaction that, based upon the testimony of the experts on both sides of this case,[7] plaintiffs' econometric methodologies have a reasonable probability of establishing whether copper futures prices were artificial during the Class Period. Again, to the extent that they do not, such deficiency is a matter to be ascertained by trial and not for a determination as to the appropriateness of class certification. *See In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y.1996) ("We need not consider [defendant's expert affidavit] in detail, as it is for the jury to evaluate this conflicting evidence and to determine what weight to give the expert's conclusions.") (citations omitted); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 522 (S.D.N.Y.1996) ("The Court need not decide at [the class certification] juncture what [economic methodologies are] best suited to the particularities of this case. It is sufficient to note at this stage that there are methodologies and that Rules 23(c)(1) and (d) allow ample flexibility to deal with these issues."); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 696–97 (D.Minn.1995) ("This case presents the familiar 'battle of the experts.' The certification stage of this litigation is not, however, the proper forum in which to resolve this battle.").

In addition, contrary to Global's assertions, common proof that Global Minerals and Sumitomo were holding large positions and there-

by defrauding the market in order to drive up prices is indeed relevant to the existence of an artificial price:

> [T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and *search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market.* When the aggregate forces of supply and demand bearing on a particular market are all legitimate, it follows that the price will not be artificial. On the other hand, when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial. *Thus, the focus should not be as much on the ultimate price, as on the nature of the factors causing it.*

*In re Indiana Farm Credit Bureau*, [1982–84 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, 1982 CFTC LEXIS 25 at 27,288 n. 2 [(CFTC December 17, 1982)] (Emphasis added). In *Indiana Farm*, the CFTC held that there was no manipulative intent on the part of defendants and, therefore, explicitly held that prices were not artificial because "we conclude that no ... illegitimate factor [was] present in the pricing aggregate in the instant case." *Id.* LEXIS at p. 27.

Global further maintains that plaintiffs' proposed Class and subclasses are rife with internal conflict because Class members have differing and conflicting interests in establishing when the prices of copper futures contracts were manipulated and the extent of any such manipulation. Global argues that the proposed Class fails to distinguish among traders with different interests in molding the evidence to be presented in this case. With such competing interests among class members, Global maintains that plaintiffs have failed to establish that common issues will predominate under the class definition currently proposed.

Global points to an alleged conflict between a trader who initiated a position and

---

**7.** Global's expert has agreed that some of plaintiff's methodologies may work to establish whether prices were artificial, and has declined an opportunity to say that some of plaintiffs' proposals will not work.

another who closed a position on the same trading day. Under those circumstances, two plaintiffs will want to prove that the opposite occurred on the same day—the purchasers will need to demonstrate that the price of copper futures was artificially high, and the seller will want to prove that the price on that day was not being manipulated.[8]

However, Global overlooks the fact that Global Mineral's positions and Comex copper prices are objective historical facts which already exist. All Class members have a common interest in pursuing the largely mathematical enterprise of establishing a correlation between these positions and prices. *See In re LTV Sec. Litig.*, 88 F.R.D. 134, 141, 149 (N.D.Tex.1980) (stating that "available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the opportunity for ... manipulation of data" and characterizing the calculation of damages as a "mechanical" matter). While Global offers a statement by plaintiffs' expert in support of its position that Class member conflicts render class certification inappropriate, the Court finds the testimony to be quite supportive of the proposed Class:

> I suppose, one might hope that my results turned up a certain type of price artificiality and the other might hope it turned up another price artificiality, but that is not what I do; I don't set out to find artificially high or artificially low prices.... They would have a conflict or a difference in what they would want my answer to be, that is true, but they would not have a conflict as to what they wanted me to do.

*Transcript of Deposition of Franklin R. Edwards* (July 6, 1998) at 181:20—183:3. Moreover, Global's conflict arguments apply only to the issue of damages and can be dealt with by the Court at that time.[9]

■ Global argues further that "in and out traders" within each subclass will have conflicts with one another as to the amount of artificiality that, ideally, each would want to exist on any day in order to maximize the amount of his or her damages. However, it is settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class. *Green v. Wolf,* 406 F.2d 291, 299–301 (2d Cir.1968), *cert. denied sub nom., Troster, Singer & Co. v. Green,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969) (where common course of conduct alleged to manipulate the market price of the subject stock, class action treatment is appropriate, especially where separate trials on issues such as individual damages can be ordered if necessary).[10] Moreover, it is hornbook law that

---

8. Global's reliance during oral arguments on an unpublished Illinois case, *Centurions v. Ferruzzi Trading International, S.A.,* No. 89 C. 7009, 1994 WL 114860 (N.D.Ill.1993), and on a 1979 Illinois case, *Smith v. Groover,* 468 F.Supp. 105 (N.D.Ill. 1979), is misguided. In *Smith,* the plaintiffs alleged that the defendants bucketed customers' orders. *Smith* did not involve a RICO claim. Moreover, the class period proposed in *Smith* covered eight years, a much longer period than that to be certified here. *Centurions* also did not involve a RICO claim and is similarly unpersuasive.

9. If potential conflicts are later shown to go to the issue of liability, the Court could decertify the class or create additional subclasses if and when this hypothetical problem rises above the level of mere conjecture. *See National Super Spuds Inc. v. New York Mercantile Exch.,* 77 F.R.D. 361, 364 (S.D.N.Y.1977) (stating that "... if it should later appear that class status was improvidently granted, the court will not hesitate 'alter or amend' its

decision, pursuant to Rule 23(c)1, to eliminate the problem either by the creation of subclasses, the designation of specific issues only for class treatment, or, if necessary, the decertification of the class").

10. *See also In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 43–44 (E.D.N.Y.1997) (potential conflicts between class members who sold their stock and those who did not related to the issue of damages and not to the determination of liability, and as such were best resolved after the liability stage of the litigation); *Nathan Gordon Trust v. Northgate Exploration, Ltd.,* 148 F.R.D. 105, 108 (S.D.N.Y.1993) (defendants' arguments that class should exclude in-and-out traders because those traders would have conflicting interests with other class members were not convincing even if later issues as to damages arose); *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1215 (S.D.N.Y.1992) (rejecting defendant's attempts to disqualify

"doubts as to the certainty of damages will be resolved against the wrongdoer, as the wrongdoer must bear the risks of the uncertainty which his conduct has created." 22 *Am.Jur.*2d *Damages* § 491 (1988).[11] In this case, where all class members are unified in their task to prove the common existence of the conspiracy to manipulate copper futures prices and develop the related proof thereon, the Court finds no basis for deviating from well-established precedent simply because the case here involves commodities instead of securities.

Finally, Global asserts that conflicts will arise between subclasses because of spread trading, hedge trading and arbitrage, all of which would entail a trader being both in the short subclass and in the long subclass, with competing interests in establishing the fact of, and the extent of, any manipulation with respect to the corresponding short and long legs. However, no cases have been submitted or found holding that the inclusion of such traders creates conflict. Numerous cases hold that the inclusion of such traders is proper.[12]

■ Plaintiffs have demonstrated that there will be questions of law and fact common to all class members in proving (a) that the conspiracy caused artificial prices to exist and (b) the amount of artificiality. Specifically, plaintiffs have demonstrated that, if the particular conspiracy alleged here is proved to exist, then all class members would have a common interest (a) to submit expert and other testimony attesting that the conspiracy caused Comex copper futures prices to be higher than otherwise and, in fact, were artificial; (b) to prove that the conspiracy caused· copper Comex futures prices to be artificial; and (c) to submit the expert testimony based on specified methodologies, showing the difference on a daily basis between what copper prices actually were and what copper prices would have been in a free and competitive market untainted by any manipulative conduct.

■ Because a single, continuous conspiratorial artifice is alleged, the relevant proof will not vary among class members, and the case presents a fundamental question of the utmost importance to all class members.[13] Every plaintiff and every class member will

---

plaintiffs because of the timing of their purchases, and stating that, even if differing interests regarding timing of transactions should arise, "the greater weight of recent authority militates against denying class certification on that ground"); *Michaels v. Ambassador Group, Inc.*, 110 F.R.D. 84, 89–90 (E.D.N.Y.1986) ("It is well established ... that any such conflict between early and late purchasers will not be sufficient to deny a motion for class certification if all the misrepresentations relied upon are interrelated or part of a common scheme to defraud.").

11. *See also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (stating that "the risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party"); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

12. *See, e.g., National Super Spuds Inc. v. New York Mercantile Exch.*, 77 F.R.D. 361, 372, n. 12 (S.D.N.Y.1977) (the three types mentioned by Global—hedgers, day traders, and spreaders—and all other types of sellers included in the class over defendants' objections); *Pollock v. Citrus*

*Assoc. of New York*, CCH Comm. Fut. L. Rep. ¶ 21, 292 (S.D.N.Y. Nov. 19, 1981) (inclusion of spread trader, even as proposed class representative, proper though representative held inadequate for unrelated reasons). .

13. Global also argues that plaintiffs' allegations of a conspiracy to manipulate the copper market fail to meet the standard of commonality because the Complaint alleges multiple conspiracies and events of manipulation. Global maintains that each of these conspiracies requires an independent determination as to whether such a course of conduct resulted in artificial prices, and was pursued with the intent to manipulate the market, thereby causing individual plaintiff's issues to predominate over issues shared by the Class. However, as the Court has already noted in its decision denying Global's motion to dismiss the RICO claim, a plain reading of the Complaint confirms that, despite the identification by plaintiffs of the specific methods by which defendants accomplished their manipulation, plaintiffs allege that a single conspiracy made one continuous misrepresentation based upon continuously-held but illusory cash market contracts in order to falsely justify one long position in copper futures contracts, artificially inflate demand, and defraud the market throughout the Class Period. *See In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 456–57 (S.D.N.Y.1998).

have to engage in the same extensive international discovery and develop the same detailed proof to demonstrate a violation of the CEA and RICO. The predominance requirement under Rule 23(b)(3) is therefore satisfied.

### C. *Rule 23(a)(3): Typicality.*

 Rule 23(a)(3) requires that plaintiffs' claims be typical of the class. "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir.1996), *aff'd sub nom., Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). However, "[t]ypicality does not ... require that the representatives' claims be identical to those of the class members." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200–01 (S.D.N.Y.1992). "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992).

Global argues that, due to the number of trading days in the proposed Class Period, the proposed class representatives, who traded on isolated dates during this time period, could only have been injured by a fraction of the conduct attributed to the defendants, rendering their claims atypical. However, the simple fact that Class members may have purchased and sold copper futures at different times, for different purposes, does not detract from the fact that every class member purchased or sold the same fungible copper futures contract in the same centralized Comex market.

Class certification has been granted in cases with far more variation in fact among class members. *See, e.g., In re Prudential Sec., Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y.1995) ("typicality requirement ... does not require that named plaintiffs invest in all related partnerships that are the subject of the action"); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D.Ga.1991) (typicality requirement satisfied, notwithstanding fact that the 12.5 million class members purchased tickets for array of different routes, at diverse times, at a multitude of varying prices, and on diverse terms); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 270–71 (D.Minn.1989) (the claims of class representatives who purchased only certain types of wirebound boxes, but not others, need not have been "coextensive" with the class, and to the extent the "representatives' claims diverge[d] from those of the proposed class, they [did] not create interests which conflict[ed] with those of the class"); *Cumberland Farms, Inc. v. Browning–Ferris Indus., Inc.*, 120 F.R.D. 642, 644–47 (E.D.Pa.1988) (national price fixing class certified notwithstanding negotiated sales of waste disposal services, a "nonhomogeneous service rather than a fungible commodity," in "an industry wherein decision-making is decentralized" locally among defendants and 10,000 other sellers); *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y.1982) (multitude of alcoholic beverage products and brands sold at diverse prices did not destroy typicality); *In re South Central States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 417 (M.D.La. 1980) ("[a]lthough ... members of the proposed class, bought through different mechanisms ... the essential claim of both [class representative] and the class members is that the prices paid were established by combination or conspiracy"); *Muth v. Dechert, Price & Rhoads,* 70 F.R.D. 602 (E.D.Pa.1976) (plaintiffs who purchased their shares during the initial public offering can represent class purchasing shares at later times).

Global alternatively asserts that the proposed Class representatives' claims are not typical of the class because the claims of CNA Metals, Hybrid Fund LP and Jack Khazzam will be subject to the defense that they ignored market news for a sustained period of time, and thus failed to mitigate the damages stemming from their trading losses. Because other class members may not be subject to this defense, Global maintains that the representatives claims are not typical of the class under Rule 23(a)(3).

■ However, "[t]he rule barring certification of plaintiffs subject to unique defenses is not 'rigidly applied in this Circuit … Indeed, it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members.'" *Langner v. Brown*, No. 95 Civ 1981, 1996 WL 709757 at *3 (S.D.N.Y. Dec. 10, 1996) (*quoting Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200–01 (S.D.N.Y.1992)); *accord Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D.Pa. 1995) ("when inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of plaintiffs."). Moreover, the particular defense raised by the defendants (failure to mitigate) goes solely to the amount of damages, not the presence of the claim. *See In re AM Int'l Sec. Litig.*, 108 F.R.D. 190, 196 (S.D.N.Y.1985) ("It is well established that individual questions with respect to damages will not defeat class certification or render a proposed representative inadequate unless that issue creates a conflict which goes to the heart of the lawsuit.").

■ Here, Rule 23(a)(3) typicality is satisfied because 1) all plaintiffs and all proposed Class members, as purchasers and sellers of copper futures contracts, were affected by, and their claims arise from, the same alleged conspiracy to manipulate copper prices and 2) all plaintiffs and all proposed Class members make the same legal claims under the CEA and RICO. The single conspiracy alleged is to be proved as to all class members by the same "course of events" (and the same legal arguments) which will establish the violations of RICO and the CEA. To the extent that particular Class members are later found to be subject to defenses, "a court can certify a class while reserving the right to shape the class more precisely to fit the issues of the case as those emerge during the litigation." *Langner*,

1996 WL 709757 at *4; Fed R. Civ. P. 23(c)(1) ("An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.").

**D. Rule 23(a)(4): Adequacy of Class Representation.**

■ Rule 23(a)(4) requires that, in order for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation requires that the class representative's attorney be qualified, and that the class representative not have interests conflicting with the class in the litigation at hand. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir.1982). Both of these criteria are satisfied here.

The Executive Committee counsel appointed by the Court have conducted previous antitrust, securities and commodity futures class actions in this Circuit and have vigorously investigated, developed and prosecuted the claims in this litigation. Global does not challenge the qualifications of plaintiffs' counsel and the Court finds no reason to do so here. Plaintiffs' counsel are qualified for the purposes of Rule 23(a)(4).

■ Although Global challenges the suitability of certain proposed Class representatives, the Court is satisfied that there are no conflicts between the representative parties and other Class members. As to the existence of alleged conflicts because Class members have differing interests in establishing the dates and amounts of manipulation, they do not give rise to a material conflict defeating adequacy under Rule 23(a)(4) for the same reasons that they do not frustrate predominance of common issues under Rule 23(a)(2) and (b)(3). As to the existence of varying lengths of trading activity among the Class representatives and Class members,[14]

14. Some question has been raised in the papers about *Gordon v. Hunt*, 98 F.R.D. 573 (S.D.N.Y. 1983). In that case, the plaintiff moved to certify a class of all persons who traded silver futures contracts between August 7, 1979 and March 26, 1980. The Court granted the motion for the

period during which the named plaintiff traded, from August 7 until August 27, 1979, but denied the motion as to remainder of the proposed class period. The court there found that the named plaintiff was not an adequate class representative under Rule 23(a)(4) for the full seven and a half

and as to the allegations of unique defenses against some representatives, these do not give rise to a material conflict defeating adequacy per Rule 23(a)(4) for the same reasons that they do not frustrate typicality under Rule 23(a)(3).

Global argues that Vincent Zuccarelli ("Zuccarelli"), Hybrid Fund LP ("Hybrid") and CNA Metals, Inc. ("CNA") are inadequate class representatives because of an alleged failure to produce their complete trading records. Defendants cite *O'Neil v. Appel,* 165 F.R.D. 479, 493 (W.D.Mich.1996) in support of their position. However, in *O'Neil,* the plaintiff was an inadequate representative because the complaint failed to allege a specific date on which plaintiff made his purchase of securities, and no evidence was otherwise presented from which to determine the date of purchase. Thus, plaintiff could have purchased outside of the class period. Here, Zuccarelli, Hybrid and CNA are properly alleged to be, and have produced ample records showing, that their trades were made within the Class Period. To the extent that certain records are deemed to be insufficient by Global, Global

cites no case which precludes class representation based upon the failure to produce complete trading records at the certification stage, and the Court is not inclined to so hold here.

Global also argues that Zuccarelli's alleged lack of credibility renders him an inadequate Class representative. This claim is based upon a prior Comex determination that Zuccarelli engaged in illegal "wash trades,"[15] and Global's allegation that he has been dishonest regarding that determination in his deposition. However, these alleged "wash trades" took place in 1987, eleven years ago, and the Court is not convinced that Zuccarelli's deposition testimony, taken as a whole, was not credible. More importantly, Zuccarelli's "credibility has not been questioned on matters critical to the lawsuit." *Langner v. Brown,* No. 95 Civ.1981, 1996 WL 709757 at *7 (S.D.N.Y. Dec. 10, 1996 ) (*citing Epifano v. Boardroom Bus. Prod., Inc.,* 130 F.R.D. 295, 301 (S.D.N.Y.1990) (class certified over defendant objection regarding plaintiff credibility as credibility was not challenged on issues central to the complaint)).[16]

---

month proposed class period because "it is unrealistic to expect Gordon to have equal incentive to develop all of the intricate facts occurring after August in this exceptionally complex case once he has proven the existence of a conspiracy in August." *Id.* at 579.

The present case is quite distinguishable from *Gordon. Gordon* involved only one proposed class representative who traded only during the first three weeks of the proposed seven and half month class. Here, there are numerous plaintiffs with holding periods throughout most of the Class Period (including at the end of the Class Period, by which time, even on the *Gordon* facts, the class representatives clearly have an incentive to develop all the long history of the positions and prior occurrences). Moreover, only by looking at all of the alleged uncommercial acts from their beginning to their liquidation in June 1996 and thereafter, can an economist or market analyst create a complete picture of whether the positions held by Sumitomo and Global were motivated by commercial or by conspiratorial needs.

15. Wash trades—the execution of purchases and sales whose combined financial result is close to or equal to zero—are a form of "fictitious trading" that negate price competition and amount to an "intentional creation of a nullity." *In re*

*Glass,* CFTC Docket No. 93–4, 1998 CFTC LEXIS 95, at **49–50 (CFTC Apr. 27, 1998)

16. Zuccarelli's situation is very different from the cases cited by Global in support of their claim that his questionable credibility renders him unfit as a Class representative. In *Kline v. Wolf,* 702 F.2d 400, 402–03 (2d Cir.1983) the two proposed class representatives were denied class certification. One plaintiff was refused class representative status because he testified that he relied upon a report which he later admitted did not exist at the time he said he relied upon it. The other plaintiff refused to answer proper discovery questions and said she had relied upon her husband's advice to buy the stock. The husband was subsequently deposed and he claimed he was advised by his broker, yet his broker disclaimed any advice to the husband or the wife.

In *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981) *vacated and remanded sub nom. Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), plaintiff gave four separate stories regarding her conversation with her broker about the purchase of stock. *Id.* at 368. Likewise, in *Darvin v. International Harvester Co.,* 610 F.Supp. 255 (S.D.N.Y.1985), plaintiff gave directly inconsistent testimony regarding the impact an allegedly misrepresented loan agreement had on his decision to purchase defendant's stock. *Id.* at 256–57.

### E. *Rule 23(b)(3): This Action is Superior to Any Possible Alternatives.*

■ Here, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). The utility of presenting the claims asserted in this action through the class action method is substantial since at least 1500 individuals may have been injured, but many of those individuals may not have been damaged to a degree which would induce him to institute litigation solely on his own behalf.[17]

Moreover, any problems in the management of this lawsuit which might arise will not unduly stretch the creative capacities of counsel or the Court. Plaintiffs have presented affirmations attesting that all class members may be identified and notified based upon the records whose preservation is legally required, and that the calculation of the financial results of all trades by class members may be undertaken in a single computerized data base. Additionally, plaintiffs' experts have attested that the amount of price artificiality caused by the defendants may be calculated by classwide methods, on a percentage or absolute basis for each day.

That numerous events affect prices in public markets does not constitute a serious consideration regarding manageability. Prices fluctuate and numerous price-impacting events occur in the stock market every day. But such events are not a bar to class certification of a securities case, nor are they here. As appositely stated in *In re Workers' Compensation*, 130 F.R.D. 99, 110 (D.Minn. 1990):

> [D]efendants' parade of horrors is chimerical. They know, as does this Court, that this case can be managed. It does not take a battalion of rocket scientists to handle a large case—although each side clearly have talented and competent counsel. If the plaintiffs' claims are substantiated, a question as to which the Court presently has no opinion, the class action mechanism is clearly the most efficient means of resolving the many claims which may be

asserted.... If the case were not handled as a class, thousands of small claims would be either brought or unjustly abandoned. The first possibility would be a flood of cases, the second would involve individual claims abandoned because of cost.

### Conclusion

The motion for certification is granted.

SO ORDERED.

---

**17.** The Court is not aware of any pending lawsuits by individual plaintiffs. Given the enormous expenditures necessary to litigate the claims at issue here, it is not surprising that no individuals have undertaken to independently challenge Global's alleged misconduct.