Pasha S. ANWAR, et al., Plaintiffs,

v.

**FAIRFIELD GREENWICH LIMITED, et al., Defendants.**

No. 09 Civ. 0118 (VM).

United States District Court, S.D. New York.

Feb. 25, 2013.

Christopher Lovell, Victor E. Stewart, Jody Krisiloff, Lovell Stewart Halebian Jacobson LLP, Howard L. Vickery, II, Boies, Schiller & Flexner, LLP, New York, NY, Adam S. Deckinger, David A. Barrett, Eli Justin Glasser, Jonathan Edgar Pollard, Sashi Bach Boruchow, Stuart Harold Singer, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, Susan E. Klock, Boies, Schiller & Flexner LLP, for Plaintiffs.

Mark Geoffrey Cunha, Michael Joseph Chepiga, Jeffrey Edward Baldwin, Jeffrey Lawrence Roether, Paige Elizabeth Fleming, Paul Jacob Sirkis, Peter Eric Kazanoff, Philip A. Mirrer–Singer, Sara Ann Ricciardi, Simpson Thatcher & Bartlett LLP, Glenn Kurtz, White & Case LLP, Andrew J. Levander, David Scott Hoffner, Dechert, LLP, Adam K. Grant, Daniel R. Benson, Daniel J. Fetterman, Marc E. Kasowitz, Kasowitz, Benson, Torres & Friedman, LLP, Helen Virginia Cantwell, Mark P. Goodman, Debevoise & Plimpton, LLP, Allan J. Arffa, Andrew Garry Gordon, Brad Scott Karp, Leslie Gordon Fagen, Patrick James Somers, Paul, Weiss, Rifkind, Wharton & Garrison Llp, New York, NY, Jennie Boehm Krasner, Dechert, LLP, Princeton, NJ, Amanda McGovern, Dyanne Eyce Feinberg, Elizabeth A. Izquierdo, Lewis Nathan Brown, Terence Michael Mullen, Gilbride Heller & Brown P.A, Anisley Tarragona, Annette Urena, Catherine Whitfield, John T. Houchin, Joshua Daniel Clark, Brown and Heller P.A., Miami, FL, Amy E. Crawford, Brenton Rogers, Emily Nicklin, Kirkland & Ellis LLP, Chicago, IL, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School (collectively, "Plaintiffs"), brought this class action on behalf of individuals and entities who invested large sums of money in four investment funds (the "Funds") created and operated by the Fairfield Greenwich Group ("FGG"). The overwhelming majority of Plaintiffs' money was in turn invested by FGG in the Ponzi scheme operated by Bernard Madoff ("Madoff") under the auspices of Bernard L. Madoff Investment Securities, Inc. ("BLMIS"), and for which Madoff was sentenced to 150 years in prison following his guilty plea. *See United States v. Madoff,* No. 09 Cr. 0213 (S.D.N.Y. June 29, 2009).

Plaintiffs are suing a number of FGG entities, executives, and other professional service providers who audited, administered, or served as custodians of the Funds. In the Second Consolidated Amended Complaint (the "SCAC"), filed September 29, 2009, Plaintiffs allege violations of federal securities law and common law tort, breach of contract and quasi-contract causes of action against FGG and associated entities and individuals (the "Fairfield Defendants"),[1] several Citco entities (collectively, "Citco"),[2] two PricewaterhouseCoopers entities (collectively, "PwC"),[3] and GlobeOp Financial Services, LLC ("GlobeOp") (collectively, "Defendants"). Plaintiffs allegations are detailed more fully in this Court's prior opinions in this action, *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 354 (S.D.N.Y.2010) ("*Anwar I*") and *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372 (S.D.N.Y.2010) ("*Anwar II*").

---

1. In addition to FGG, these entities and individuals include Fairfield Greenwich Advisors LCC ("FGA"), Fairfield Greenwich Ltd. ("FGL"), and three wholly-owned FGL subsidiaries: Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), Fairfield Risk Services Ltd. ("FRS"), Fairfield Heathcliff Capital LCC ("FHC"), Walter M. Noel Jr. ("Noel"), Jeffrey H. Tucker ("Tucker"), Andres Piedrahita ("Piedrahita"), Amit Vijayvergiya ("Vijayvergiya"), Daniel E. Lipton ("Lipton"), and Mark McKeefry ("McKeefry").

2. Citco is defined to include defendants Citco Group Ltd. ("Citco Group"), Citco Fund Services (Europe) B.V. ("CFSE"), Citco (Canada) Inc. ("CCI"), Citco Global Custody N.V. ("Citco Global"), Citco Bank Nederland N.V. Dublin Branch ("Citco Bank,"), and Citco Fund Services (Bermuda) Ltd. ("CFSB").

3. Plaintiffs' surviving claims are against PricewaterhouseCoopers LLC ("PwC Canada"), and PricewaterhouseCoopers Accountants Netherlands N.V. ("PwC Netherlands").

Plaintiffs now move, pursuant to Rule 23 of the Federal Rule of Civil Procedure 23 ("Rule 23"), to certify a class (the "Class" or "Proposed Class") comprised of:

all shareholders/limited partners in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (the "Funds") as of December 10, 2008 who suffered a net loss of principal invested in the Funds.

(Pls.' Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.' Mem.") at 1.)[4] For the reasons discussed below, Plaintiffs' proposed class definition is modified to exclude members of the Proposed Class whose investments in the Funds were made in the following countries: Switzerland, France, Luxembourg, Israel, Kuwait, Korea, North Korea, Picairn, Tokelau, Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino, Namibia, Monaco, Germany, and South Africa (collectively, the "Excluded Countries"). The Court finds that the Proposed Class, modified as indicated, satisfies all of the requirements of Rule 23(a) and the pertinent requirements of Rule 23(b). This Class is subject to further adjustment or decertification as warranted as facts develop.

## I. BACKGROUND[5]

The SCAC alleges a common course of wrongful conduct by the Fairfield Defendants characterized by a continuous series of false representations and material omissions that began from the founding of the Funds in 1990 to Madoff's confession of wrongdoing in December 2008. Specifically, Plaintiffs claim that uniform marketing materials and the periodic updates about the Funds' performance falsely represented (1) that the Plaintiffs' investments were actually invested by Madoff in the so-called "split-strike conversion" strategy; (2) that Madoff's strategy resulted in substantial, consistent returns; and (3) that FGG had performed extensive

due diligence, continually monitored Madoff's operations and, as a result, had full access to all of Madoff's operations. (SCAC ¶ 182.) The SCAC contains myriad examples of these misrepresentations or omissions, including the alleged investment via a "split-strike conversion," an investment which never actually occurred, (id. ¶ 184), information showing "substantial, consistent annualized rates of return for the Funds," (id. ¶ 187), and that FGG was simply recycling information that Madoff had provided and did nothing to independently verify whether investments occurred or whether the returns Madoff reported were accurate, (id. ¶ 189; see also id. ¶¶ 184–216, 229, 231, 233.) Plaintiffs further allege that FGG made these misstatements or omissions despite numerous "red flags" that should have put FGG on notice that Madoff was not being honest.

The SCAC also brings claims against Citco, PwC, and GlobeOp related to the services that these entities allegedly provided to FGG. Specifically, Plaintiffs claim that the Funds' administrators, Citco and GlobeOp, and auditor, PwC, failed to conduct any due diligence and wholly failed to fulfill their duties, thereby assisting the Funds in their fraud and breaches of fiduciary duties, and ultimately allowing Madoff to abscond with Plaintiffs' money.

Defendants moved to dismiss the SCAC and in two orders, as detailed in *Anwar I* and *Anwar II*, the Court denied in part and granted in part Defendants' motions to dismiss, familiarity with which is assumed.

## II. DISCUSSION

### A. STANDARD OF REVIEW

To certify the Proposed Class, Plaintiffs must satisfy all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3). *See In re Livent Noteholders Sec.*

---

4. Excluded from the Class definition are the Defendants, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

5. A more detailed description of the facts of this case is provided in Anwar I and Anwar II. Unless otherwise indicated, all facts in the Background section are taken from these opinions, and the documents on which they relied.

*Litig.*, 210 F.R.D. 512, 514 (S.D.N.Y.2002) (*"Livent"*).

To meet Rule 23(a)'s prerequisites, Plaintiffs must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Rule 23(b)(3) further requires that Plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action "is superior to other available methods" of adjudication. Fed.R.Civ.P. 23(b)(3).

■ Trial courts are given substantial discretion in determining whether to grant class certification because " 'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.' " *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (*quoting In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d cir.2001) (*"Sumitomo III"*) (alteration in original)). The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions. *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 88–89 (S.D.N.Y.1998) (*"Sumitomo I"*); *see also In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 481 (S.D.N.Y.2000) (*"Sumitomo II"*). As the Second Circuit stated in *Green v. Wolf Corp.*, " 'if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.' " 406 F.2d 291, 298 (2d Cir.1968) (*quoting Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968)).

## B. RULE 23(a) REQUIREMENTS

### 1. Numerosity

■ To meet the requirements of Rule 23(a)(1), "the class must be so large that joinder of all members would be impracticable" (the "Numerosity Requirement"). *Sumitomo II*, 194 F.R.D. at 482 (*citing In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir.1992)). Although precise calculation of the number of potential class members is not required, the Second Circuit has observed that "numerosity is presumed at a level of 40 members." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y.2007) (*citing Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995), cert. denied, 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995)) (quotation marks omitted) (*"Vivendi"*).

■ During the Proposed Class Period, approximately 1,000 members of the Proposed Class maintained accounts with the Defendants and therefore Plaintiffs clearly meet the Numerosity Requirement. (*See* Pls.' Mem. 3.)

### 2. Commonality of Law or Fact Questions

Rule 23(a)(2) requires plaintiffs to demonstrate that common issues of law or fact affect all class members (the "Commonality Requirement"), which has been characterized as a "low hurdle." *See Sumitomo II*, 194 F.R.D. at 482 (*citing In re Prudential Sec. Litig.*, 163 F.R.D. 200, 206 n. 8 (S.D.N.Y. 1995)).

■ It is evident that common questions of law and fact exist in this proceeding. Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied. *See, e.g., Vivendi*, 242 F.R.D. at 84. The claims of the Proposed Class clearly arise from a common course of conduct by Defendants and Plaintiffs specifically allege that certain actions and statements by the Defendants led to the concealment of Madoff's Ponzi scheme and were misleading with respect to material facts. Furthermore, there are numerous issues of law and fact that are common to the

Proposed Class, including whether: (1) Defendants were complicit in Madoff's Ponzi scheme; (2) Defendants omitted or misrepresented material facts; (3) Defendants knew or recklessly disregarded that these statements were false or misleading; (4) Defendants breached duties owed to the Plaintiffs; and (5) Plaintiffs suffered damages and the extent and appropriate measure of damages.

Accordingly, because Plaintiffs allege a common course of fraudulent conduct, the Commonality Requirement is satisfied.

### 3. *Typicality*

Rule 23(a)(3) requires that Plaintiffs' claims be typical of the class (the "Typicality Requirement"). "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Sumitomo I,* 182 F.R.D. at 94 (internal quotation marks and citation omitted).

■ Here, Plaintiffs allege that they will use common evidence to prove that Defendants "misrepresented the nature and extent of their due diligence and compliance with industry standards, which, if performed as represented, would have prevented the loss of billions of dollars" to the Class. (Pls.' Mem. 6.) Furthermore, Plaintiffs argue that individual members of the Class will not be subject to unique defenses because investments in the Funds were made only through private placement transactions, and nearly all the information related to the investments came from the Defendants.

Accordingly, Plaintiffs have sufficiently demonstrated that the potential class members' claims satisfy the Typicality Requirement of Rule 23(a)(3).

### 4. *Adequacy*

■ Rule 23(a)(4) requires that the representative of the parties will "fairly and adequately protect the interests of the class" (the "Adequacy Requirement"). Fed. R.Civ.P. 23(a)(4). To meet this requirement, the lead plaintiffs' counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," and the class repre-

sentatives must not have interests conflicting with the class, *Livent,* 210 F.R.D. at 517 (internal citations and quotation marks omitted). The Court finds that both requirements are satisfied in the instant matter.

■ Plaintiffs' attorneys have vigorously pursued these claims to date and have adequately represented classes in other securities litigation and other complex class actions. Therefore, counsel for the Plaintiffs are qualified for the purposes of Rule 23(a)(4).

Additionally, no conflicts of interest between the Plaintiffs and members of the Class have been raised by any of the parties here.

Accordingly, the Court finds that Plaintiffs have satisfied the Adequacy Requirement of Rule 23(a)(4).

### D. *RULE 23(b)(3) REQUIREMENTS*

In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b). Plaintiffs seek to certify the Proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "Superiority Requirement"). Fed.R.Civ.P. 23(b)(3). "A class certified under Rule 23(b)(3) is sometimes referred to as an 'opt-out' class because Rule 23(c)(2) mandates that members of a class certified pursuant to Rule 23(b)(3) be afforded the opportunity to 'request exclusion' from that class." *Vivendi,* 242 F.R.D. at 90. Should the Court certify the Proposed Class, any investor—foreign or domestic—who does not opt out of the class "is bound by the final disposition of the case." *Id.*

### 1. *Predominance Requirement*

■ The Predominance Requirement is a more demanding standard than the Commonality Requirement and is satisfied if the "resolution of some of the legal or factual ques-

tions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (*citing Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002)). The Predominance Requirement is "readily met in certain cases alleging ... securities fraud." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ Defendants argue that the Proposed Class should not be certified because individual issues of reliance foreclose a finding of predominance. Specifically, Defendants claim, among other things, that Plaintiffs allegedly relied on certain non-uniform materials—or, on the flip-side, did not uniformly rely on certain materials, uniform or otherwise. Defendants further allege that Plaintiffs varied in their sophistication and access to information, and that, in any event, the Defendants never actually "made" these representations. Plaintiffs counter that (1) reliance can be demonstrated based on common, circumstantial evidence and that, at the least, Plaintiffs relied on core misrepresentations and omissions by Defendants; (2) reliance can be shown because the fraud created a market that would never otherwise have existed; and (3) the presumption of reliance under *Affiliated Ute* applies to Defendants' material omissions. The Court concludes that, even absent a "fraud created the market" theory or the *Affiliated Ute* presumption of reliance, common questions of law and fact clearly predominate over any individual issues.

As this Court noted under similar circumstances in another case, even assuming Defendants' claims that certain "communications to class members may not have been uniform, they allegedly were uniformly misleading. The variations are therefore immaterial and will not defeat class certification."

*Bresson v. Thomson McKinnon Sec. Inc.,* 118 F.R.D. 339, 343 (S.D.N.Y.1988). The use of third-party investment agents by the Plaintiffs also does not create individual issues of reliance that foreclose a finding of predominance because "misrepresentations made to an agent are deemed to [be] made to the principal," *In re Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 408 (S.D.N.Y.2010). This conclusion is only buttressed by the fact that there was little to no publically available information relating to Madoff investments, and therefore any information relating to the Funds, whether provided to Plaintiffs or Plaintiffs' agents, was likely obtained through the Defendants.

Furthermore, to the extent the Defendants' other arguments in opposition to class certification relate to the merits of the dispute and do not directly pertain to the predominance inquiry or other Rule 23 requirements—such as whether Defendants can be deemed to have "made" any of the statements in the relevant materials—"despite [the] parties' extensive briefing of the merits of the case, [the Court] circumscribe [s][its] present inquiry to the essentials for class certification." *Dornberger v. Metro. Life Ins. Co.,* 182 F.R.D. 72, 76 (S.D.N.Y.1998) ("In considering the certification of a potential class, the district court is not, at this stage, to assess the merits or the substance of the claims at issue but, rather, is to limit its inquiry to the satisfaction of the requirements under [Rule 23]."); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." (internal quotation marks and citations omitted)).[6] To the extent any of the merits-based arguments presented by Defendants necessitate the establishment of subclasses or the severance of some Plaintiffs,

---

**6.** As the Supreme Court has recently emphasized, the "rigorous analysis" required under Rule 23 necessarily "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The Court has rigorously considered all of the Rule

23 requirements and the merits of the case, where appropriate, in reaching the conclusion that Plaintiffs Proposed Class satisfies Rule 23's stringent requirements. Under similar circumstances, other courts in this district have reached the same conclusion. *See, e.g., In re Beacon,* 282 F.R.D. 315 (S.D.N.Y.2012).

Defendants are free to propose these remedies at the appropriate time.

The Court concludes that questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members. Plaintiffs' claims arise out of Defendants' alleged fraudulent conduct, which was directed at all investors. Plaintiffs have also alleged a series of false and misleading statements and omissions by Defendants, in violation of federal securities laws, which Plaintiffs assert affected all investors. The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured members of the Class. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues at trial, and thus, common issues predominate over individual issues. *See, e.g., In re Beacon,* 282 F.R.D. at 328–331 (applying *Affiliated Ute* presumption of reliance to certify class of investors in funds that invested assets with Madoff).

Accordingly, Plaintiffs have satisfied the Predominance Requirement.

### 2. *Superiority Requirement*

■■■ When certifying a proposed class in accordance with Rule 23(b)(3), courts must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The Superiority Requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication. *See* Fed. R.Civ.P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385 ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."). Rule 23(b)(3) identifies several factors to consider in determining whether a class action is in fact "superior to other available methods for fairly and efficiently adjudicating the controversy":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

■■■ Courts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members. *See Vivendi,* 242 F.R.D. at 95 (stating that "res judicata concerns have been appropriately grafted onto the superiority inquiry," but that the res judicata determination should not be "dispositive without either an evaluation of the likelihood of nonrecognition or a consideration of other factors which impact a determination of the superiority requirement"). Defendants assert that foreign investors [7] should be excluded from the Proposed Class and that a United States class action is not a superior method for adjudicating Plaintiffs' claims because a resulting judgment would not be given preclusive effect by the courts in the approximately seventy countries in which Plaintiffs reside (collectively, the "Foreign Courts").

#### a. *Standard*

■■■■ As this Court has stated previously, the appropriate standard for evaluating the likelihood of the Foreign Courts' recognition of a judgment rendered by this Court is whether "the Foreign Courts would probably recognize as preclusive any judgment rendered by this Court (the "Probability Standard")." *In re Alstom SA Sec. Litig.,* 253 F.R.D. 266, 282 (S.D.N.Y.2008). Under the Probability Standard,

---

7. The Proposed Class included members from a large number of foreign countries which Plaintiffs have placed into eight groups. (*See* Decl. of Sashi Bach Boruchow, dated Mar. 2, 2011 ("Boruchow Decl.") Ex. 2.) The Court will therefore analyze them within these groups.

Plaintiffs carry the burden of demonstrating that "foreign court recognition is more likely than not," but if Plaintiffs are "unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class."

*Id.* (*quoting Vivendi*, 242 F.R.D. at 95). However, even under the Probability Standard, Courts should " 'evaluate the risk of nonrecognition along a continuum,' " in determining whether, along with other factors, plaintiffs satisfy the Superiority Requirement. *Vivendi*, 242 F.R.D. at 95 (*quoting In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir.2006)). "When determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts, and the fact that United States courts have generally certified proposed classes which included [certain foreign] lead plaintiffs and class members, is particularly persuasive." *Alstom*, 253 F.R.D. at 291 (*quoting* Fed.R.Civ.P. 44.1).

The Court is currently presented with extensive dueling expert reports from preeminent practitioners and scholars debating the likelihood of foreign recognition of a United States opt-out class action judgment. The most contentious issue debated by these esteemed scholars is whether recognition of the judgment would violate a foreign country's public policy. Undoubtedly, in certain jurisdictions that have affirmatively considered the efficiency and fairness concerns implicated by class action procedures, this discussion has substantive merit and will likely determine whether a foreign court will grant recognition to a judgment by this Court. However, in the vast majority of countries that have not yet squarely confronted the issue of class actions, much less explicitly addressed

recognition of a United States class action judgment, the reams of esoteric legal analysis submitted by the parties, citing as legal authority Baron Blackburn [8] and his young-blooded contemporaries, ultimately amount to no more than high-priced arm-chair oracles, conjecture that provides little assistance to the Court, one way or another, in analyzing the likelihood of foreign recognition of this Court's judgment.

■ Therefore, the Court concludes that, where a plaintiff sufficiently demonstrates that the stated policy of a foreign country is to recognize and enforce foreign judgments, or that its law is generally inclined to favor that course of action, such a showing would create a rebuttable presumption that, absent an affirmative showing to the contrary, recognition of a particular United States judgment, even in class action litigation, does not violate a foreign country's public policy. Such a presumption is especially warranted in situations where the relevant Foreign Courts do not routinely address the underlying substantive or procedural issues considered and embodied in the United States court judgment, and therefore have not had the occasion to explicitly embrace, or reject, a particular question of procedure or substance. Following certification of the Proposed Class, should the Defendants find clear and convincing evidence that enforcement of a class-action judgment rendered in this litigation would in fact violate the public policy of any of the countries of residence of the members of a certified class, thereby calling into question the likelihood of enforcement of this Court's judgment by the courts of that foreign country, the Defendants may introduce such evidence and move to sever those members from the class at that time.

#### a. *Group 1: Netherlands and Curacao*

Under Dutch law, a foreign judgment will not be recognized unless the foreign court

---

**8.** Baron Blackburn was an eminent eighteenth century British judge and Lord of Appeal in Ordinary responsible for a number of influential contract law decisions. However, like most of the authorities cited by the parties, Baron Blackburn's opinion makes absolutely no mention of class action litigation, which is unsurprising considering the absence of class action litigation in the United Kingdom during the relevant time period. While the concept of "group litigation"

may have originated in medieval England, it had apparently "disappeared in England by the middle of the nineteenth century." Robert G. Bone, *Personal and Impersonal Litigative Forms*, 70 B.U. L. Rev. 213, 223 (1990) (*citing* Stephen C. Yeazell, *From Medieval Group Litigation to the Modern Class Action* (1987)). In most of the foreign legal authorities cited by the parties, reference to class action litigation has yet to appear.

116

based its jurisdiction on an "internationally acknowledged ground," that satisfied domestic due process requirements, and comports with Dutch public policy. (Decl. of Prof. Hans Smit, dated Mar. 1, 2011 ¶ 28 ("Smit Decl.").) The Curacao legal system is copied from the Netherlands and therefore any analysis of the likelihood of a Dutch court to recognize judgment applies equally to Curacao. (Smit Decl. ¶¶ 71–72.)

■ In the instant matter, Plaintiffs have sufficiently demonstrated that a Dutch court would more likely than not recognize a judgment rendered by this Court. The January 25, 2007 Amsterdam Court of Appeals decision *In re Dexia Bank Nederland N.V.,* rekestnummer 1783/05 (Amsterdam Court of Appeals, Jan. 25, 2007) ("Dexia") regarding the Mass Damages Act (the "Damages Act") "demonstrates the Dutch authorities' willingness to adopt opt-out class mechanisms" and "the Dutch courts' likelihood for recognizing opt-out mechanisms as generally consistent with Dutch treaties and constitutional principles." *Alstom,* 253 F.R.D. at 289–90. After examining the expert declarations and considering the parties' arguments concerning Dutch law, the Court concludes that Plaintiffs have sufficiently demonstrated that Dutch courts—and therefore those of Curacao as well—would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent Dutch class members. Accordingly, the Court will certify a class which includes class members from both the Netherlands and Curacao with claims against Defendants.

### b. *Group 2: United Kingdom, Canada and Common Law Jurisdictions*

"There is no clear authority addressing the res judicata effect of a [United States] class action judgment in England," which is an issue of English common law. *Vivendi,* 242 F.R.D. at 102; *see also* (Decl. of Prof. Jonathan Harris, dated Feb. 26, 2011 ¶ 15) ("Harris Decl."). Under English common law, British courts will generally enforce a foreign judgment if the foreign court that issued the judgment was "jurisdictionally competent." (Harris Decl. ¶ 27.) More specifically, Brit-

ish "courts will regard the overseas court as jurisdictionally competent either if the defendant had the requisite territorial connection with the foreign state," which is satisfied if a corporate defendant maintains a "fixed place of business ... at the [corporate defendant's] own expense from which it has carried out its own business in the overseas jurisdiction," or "if the defendant submitted to proceedings in that state," which includes, but is not limited to, "voluntarily pleading to the merits." (*Id.* ¶¶ 27, 29–33.)

The English common law framework for adjudging the jurisdictional competence of foreign courts focuses on the circumstances of the defendant and not those of the plaintiff. (*See id.* ¶¶ 34–38.) If the foreign judgment meets the basic requirements for recognition and enforcement, the British court will likely consider two defenses—"that the foreign judgment is in breach of natural justice" or that "it is contrary to English public policy." (*Id.* ¶ 39.) Courts of other common law countries frequently look to the law of the United Kingdom for guidance on the recognition of foreign judgments, and the law of those countries is either substantially similar to, or even more favorable than, the law of the United Kingdom regarding the enforcement of foreign class action judgments. (*See id.* ¶¶ 177–199.)

To consider a particular action a breach of natural justice, the British courts again focus on the defendant, determining whether the defendant had the opportunity to adequately defend itself by having "been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable." (*Id.* ¶ 40.) British courts rarely refuse to recognize in personam foreign judgments as contrary to English public policy, and although there is no formal analytical framework for determining a violation of English public policy, " '[t]he usual colourful examples are an order to pay damages for breach of a contract to kidnap or to sell narcotics, or those based on openly racist laws.' " (*Id.* ¶¶ 43, 88 (*quoting* Adrian Briggs et al., Civil Jurisdiction and Judgments 557 (5th ed. 2009)).) Defendants have submitted no credible evidence that British

courts would consider a class-action judgment to be either a breach of natural justice or contrary to British public policy.

■ After examining the expert declarations and considering the parties' arguments concerning English law and other common law jurisdictions, the Court re-adopts the rationale set forth in *Alstom* and concludes that Plaintiffs have sufficiently demonstrated that the courts of the United Kingdom, Canada, and other common law countries would more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this case by this Court involving absent class members from these jurisdictions. Furthermore, this Court has already concluded that both the United Kingdom and Canada would more likely than not recognize a United States class action judgment and bar absent class members from bringing later actions against the defendants. *Alstom*, 253 F.R.D. at 289; *Vivendi*, 242 F.R.D. at 103. Accordingly, the Court will certify a class which includes British, Canadian, and other common law country class members.

#### c. *Group 3: Switzerland*

Under Swiss law, a foreign judgment will be recognized in Switzerland if (1) the foreign court has jurisdiction according to Swiss legal principles; (2) the decision is final; and (3) there is no ground to refuse recognition, such as a violation of public policy, under Art, 27 of the Swiss Private International Law Act ("SPILA"). (Decl. of Phillipp Kanzig, dated Mar. 1, 2011 ¶ 29 ("Kanzig Decl."); Decl. of Prof. Isabelle Romy, dated Sept. 13, 2011 ¶ 14 ("Romy Decl.").) Plaintiffs' expert acknowledges that under the traditional Swiss legal doctrine's conception of a "party," "Absent Class Members would not … be bound by the U.S. class action judgment and could initiate duplicative litigation in Switzerland." (Kanzig Decl. ¶ 22.)

■ Therefore, the Court concludes that Plaintiffs have not sufficiently demonstrated that Swiss courts would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent Swiss class members. Finding otherwise would expose Defendants to the possibility that they may have to relitigate the same or similar issues before a Swiss court. Accordingly, the Court will not certify a class which includes absent Swiss class members.

#### d. *Group 4: France and Luxembourg*

Before a French court will recognize and give preclusive effect to a judgment rendered in a foreign court, the French court will analyze the foreign judgment under the framework primarily set forth in *Munzer v. Munzer*, which was issued by France's highest court. *See Vivendi*, 242 F.R.D. at 96; (Decl. of Alexis Mourre, dated Feb. 8, 2011 ¶ 12 ("Mourre Decl.").) The portion of the *Munzer* framework which is currently valid law may be summarized as follows: (1) the foreign court must have jurisdiction pursuant to French rules on conflict of jurisdictions (the "Jurisdictional Prong"); (2) the judgment of the foreign court is not contrary to international public policy (the "Public Policy Prong"); and (3) the action before the foreign court was not the result of forum shopping (the "Forum Shopping Prong"). *See Vivendi*, 242 F.R.D. at 96. According to Plaintiffs, courts in Luxembourg "substantially follow the French approach" for recognition and enforcement of foreign judgments. (Mourre Decl. ¶¶ 18, 87.)

■ This Court previously held that French courts would likely not enforce a foreign judgment in opt-out class action because to do so would violate French constitutional principles and public policy. *See Alstom*, 253 F.R.D. at 286–87. Recent developments have only served to confirm this conclusion. For example in an *amicus curiae* brief in *Morrison v. Nat'l Australia Bank Ltd.*, — U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), the Republic of France stated that "French courts would almost certainly refuse to enforce a court judgment in a U.S. 'opt-out' class action because it … violates French constitutional principles and public policy" and approvingly cited this Court's decision in *Alstom*. (*See* Mourre Decl. ¶¶ 16–17.)

Therefore, the Court concludes that Plaintiffs have not sufficiently demonstrated that French or Luxembourgish courts would more

likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent class members residing in France or Luxembourg. Finding otherwise would expose Defendants to the possibility that they may have to relitigate the same or similar issues before courts in France or Luxembourg. Accordingly, the Court will not certify a class which includes absent class members from France or Luxembourg.

### e. *Group 5: Spain*

The United States and Spain do not have a bilateral treaty regarding the recognition and enforcement of foreign judgments. (Decl. of Prof. Miguel Angel Fernandez–Ballesteros, dated Jan. 11, 2012 ¶ 31 ("Fernandez–Ballesteros Decl.").) Under the Spanish legal principle of reciprocity, Spanish courts will recognize a foreign judgment if that country recognizes similar Spanish judgments. (Fernandez–Ballesteros Decl. ¶ 32; Decl. of Prof. Fernando Gascón, dated Feb. 28, 2011 ¶ 19("Gascón Decl.").) Spanish law also recognizes foreign judgments where the following "system of conditions" criteria are met: (1) the judgment is final; (2) the foreign court had jurisdiction; (3) the foreign judgment was rendered pursuant to an action *in personam;* (4) the judgment was not rendered *in absentia* of the defendant and did not violate defendant's due process rights; (5) the decision is not contrary to the public policy of Spain; and (6) the decision is "authentic," meaning that it complies with all requirements of the foreign state, and is not in conflict with any prior Spanish judgment. (Fernandez–Ballesteros Decl. ¶ 35; Gascón Decl. ¶¶ 36–38.) The parties do not dispute that any judgment here would likely satisfy most of these criteria; however, they do offer different opinions as to whether recognizing an opt-out class action judgment would violate Spanish public policy.

In certain situations, Spanish law provides for "group actions" in which multiple plaintiffs can assert their individual claims together in a single action. (Fernandez–Ballesteros Decl. ¶¶ 47–49.) Specifically, plaintiffs may bring a group action if (1) plaintiffs maintain their status as individual claimants similar to "permissive joinder"; (2) plaintiffs are similarly-situated consumers or users; or (3) plaintiffs bring their claims as part of a legally constituted association. (*Id.*) The ability to bring group actions was first enacted in 2000 and was subsequently broadened in 2002 to include injunctive relief to enjoin harmful conduct, and in 2007 to include gender discrimination claims. (Reply Decl. of Prof. Fernando Gascón, dated Apr. 24, 2012 ¶¶ 14–16 ("Gascón Reply Decl.").)

Defendants argue that members of the Proposed Class would not fall within one of these explicitly enumerated types of group actions under Spanish law and that the absence of a United States-style opt-out class action mechanism in Spain is evidence that the recognition of a judgment in this case would violate material Spanish public policy. However, Defendants fail to identify an explicit conflict with Spanish public policy that would bar recognition of the judgment. The mere fact that Spanish law does not explicitly embrace a foreign legal mechanism does not mean that it would find the judgment so repugnant that it would reject it as violating Spanish public policy. In fact, under Spanish law, certain situations exist in which collective action to enjoin clauses in contracts of adhesion may be brought without the opportunity to opt out in the first place. (Gascón Reply Decl. ¶¶ 7–8, 33.) It is inevitable that the precise contours of the procedural vehicle used to vindicate certain rights will differ between countries, however, these differences do not by definition constitute a conflict of material public policy. Holding otherwise would allow the exception to swallow the rule of comity and general recognition propounded in many foreign jurisdictions, including Spain. Based on this backdrop of fundamental acceptance of group actions under Spanish law and the explicit adoption of binding injunctive collective actions in limited situations, the Court is not persuaded that the recognition of an opt-out class action judgment would violate material Spanish public policy.

Defendants also argue that recognition of the judgment in this case would violate Spanish procedural public policy due to (1) the inability of absent class members to inter-

vene, and (2) the binding effect of the judgment on absent class members not afforded a full opportunity to participate. However, the intricacies of the Spanish collective action legal system appear to demonstrate an attempt to balance the interests of finality with the rights of individual litigants in a manner markedly similar to that of the United States judicial system. For example, in collective actions involving known parties, potentially interested parties must be notified and have the right to intervene. However, these notified, potentially interested parties will be barred from active participation if they fail to intervene prior to the filing of the complaint. (Gascón Reply Decl. ¶¶ 38–39.) The United States judicial system provides a similar mechanism by which individual plaintiffs may participate: by filing independent materials either prior to or following the appointment of lead plaintiff. Moreover, a plaintiff in the United States always has the opportunity to opt out of the litigation, and absent class members may voice objection to settlements at a fairness hearing—additional safeguards and rights not necessarily present in the Spanish system. (*Id.* ¶¶ 51–52; Gascón Decl. ¶ 95.) In some cases where the interests at stake are diffuse, Spanish courts do not require any notice *whatsoever* and interested parties that fail to intervene during a certain specified waiting period will nevertheless be bound by the eventual judgment. (*Id.* ¶ 41.)

These situations persuasively suggest that Spanish procedural public policy does not always mandate that an interested party be required to intervene or opt out at all points during certain types of collective active litigation. Instead, these individual participation rights are balanced against other competing interests in much the same way as the United States class action system provides. Therefore, the Court concludes that the recognition of a United States opt-out class action judgment would not violate Spanish procedural public policy.

In the instant matter, Plaintiffs have sufficiently demonstrated that a Spanish court would more likely than not recognize, enforce, and give preclusive effect to a judgment in this action rendered by this Court. Accordingly, the Court will certify a class which includes class members from Spain with claims against Defendants.

### f. *Group 6: Latin America*

■ The Proposed Class includes members from certain Latin American countries, specifically, Panama, Colombia, Uruguay, Brazil, Chile, Venezuela, Argentina, Ecuador, El Salvador, Peru, Dominican Republic, Mexico and Bolivia, that the Court will consider collectively for the purposes of this analysis (the "relevant Latin American countries"). (Boruchow Decl. Ex. 2.) Generally, the relevant Latin American countries, regardless of whether they are signatories, look to the principles embodied in the Bustamante Code and Inter–American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards (the "Inter–American Convention") to determine whether to recognize a foreign judgment. (*See* Decl. of Prof. Michael Wallace Gordon, dated Mar. 1, 2011 ¶¶ 20–21 ("Gordon Decl.").) While the United States is not a party to the Inter–American Convention and therefore its provisions are not binding here, the Inter–American Convention's principles reflect the general framework characteristic of the approach Latin American courts take to recognition of foreign judgments. (Gordon Decl. ¶ 25.) Under the current circumstances, the essential issues for determining the likelihood of recognition of foreign judgments are: (1) whether adequate notice of the litigation was provided to potentially interested parties, including whether the parties had an opportunity to present their claims and defenses, and whether the summons or subpoena were issued in a substantially similar fashion to that provided for in the procedures of the jurisdiction where the judgment will take effect, and (2) whether the judgment is manifestly contrary to the state's public policy. (*See* Gordon Decl. ¶¶ 23–24; Inter–American Convention arts. 2(e), (f), (h).)

After examining the expert declarations and considering the parties' arguments concerning the law of the relevant Latin American countries, the Court concludes that, under the present circumstances, Plaintiffs have made a sufficient presumptive showing that courts in the relevant Latin American

countries would more likely than not recognize a class-action judgment rendered in this case by this Court. While the majority of Latin American courts have not specifically addressed the enforcement of United States class-action judgments, the Court finds that the general policy of the relevant Latin American countries inclines to favor granting recognition to judgments of United States courts. The Court also takes into account the unlikely ability of plaintiffs from the relevant Latin American countries to bring a duplicative action in their home countries, and the absence in the record before the Court of any authority from the relevant Latin American countries expressly stating that the enforcement of a United States opt-out class action judgment would manifestly violate the public policy of any of the relevant Latin American countries. These considerations make it more likely than not that the courts of the various jurisdictions would recognize, enforce, and give preclusive effect to a judgment in this action. (*See* Gordon Decl. ¶¶ 29, 100.) Accordingly, the Court will certify a class which includes class members from the relevant Latin American countries.

### g. *Group 7: Belgium*

Generally, Belgian law provides for the automatic recognition of United States judgments. (Decl. of Jean–Pierre Fierens & Bart Volders, dated Feb. 25, 2011 ¶ 11 ("Fierens–Volders Decl.").) However, in a number of enumerated circumstances, Belgian courts must refuse to recognize judgments rendered by courts in the United States. (*Id.* ¶ 12.) In the instant case, Defendants argue that Belgian courts would refuse to recognize a judgment because (1) recognition would be manifestly incompatible with Belgian public policy, and (2) recognition would infringe upon the requirements of fair trial and due process. (*Id.*; Decl. of Prof. Dr. Hakim Boularbah and Dr. Frédéric Georges, dated Nov. 28, 2011 ¶¶ 7, 8, 48, 49 ("Boularbah–Georges Decl.").)

Although Belgian law does not currently provide an opt-out class action procedure, it does recognize a number of different collective litigation mechanisms. (Fierens–Volders Decl. ¶ 19.) The Belgian legislature has also explored expanding the availability of class actions under Belgian law, including opt-in and opt-out class actions. (Fierens–Volders Decl. ¶ 21; Fierens–Volders Reply Decl. ¶ 13–14.) Such developments are consistent with a general policy that inclines to favor class action procedures by other European Union member states, as reflected in the finding of the Amsterdam Court of the First Instance that United States opt-out class action procedures are not incompatible with the requirements of the European Code of Human Rights. (Fierens–Volders Decl. ¶¶ 22–23, 27.)

Against this backdrop, which is complemented by the absence of a showing of any controlling Belgian authority holding that the recognition of an opt-out class action judgment would manifestly violate Belgian public policy or infringe on the Belgian requirements of a fair trial and due process, Plaintiffs have made a sufficient presumptive showing that a Belgian court would more likely than not recognize a class-action judgment rendered in this case by this Court. After examining the expert declarations and considering the parties' arguments concerning Belgian law, the Court concludes that Belgian courts would more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this action by this Court involving absent Belgian class members. Accordingly, the Court will certify a class which includes class members from Belgium with claims against Defendants.

### i. *Group 8: Other Jurisdictions*

"Although plaintiffs often submit expert declarations regarding issues of foreign law, such declarations are not necessary for plaintiffs to carry their burden of establishing aspects of foreign law." *Alstom*, 253 F.R.D. at 291 (*citing* Fed.R.Civ.P. 44.1). The Court finds that Plaintiffs have met their burden of establishing that the courts of countries that are members of the European Community or signatories to the Lugano Treaty—with the exception of France, Luxembourg, and Switzerland—will more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this action by this Court involving absent class members. (*See*

Smit Decl. ¶ 73(4).) Accordingly, the Court will certify a class which includes class members from Italy, Portugal, Greece, Malta, Denmark, Norway, Sweden, and Finland with claims against Defendants.

■ However, the Court finds that the Plaintiffs have not sufficiently demonstrated that the stated policy or general inclination of the law of the following countries would more likely than not favor recognizing, enforcing, and giving preclusive effect to any judgment rendered in this action by this Court involving absent class members: Israel, Kuwait, Korea, North Korea, Picairn, Tokelau, Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino, Namibia, Monaco, Germany,[9] and South Africa (collectively, the "Additional Excluded Countries"). Therefore, the Court will not certify a class which includes absent class members from the Additional Excluded Countries.

### III. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that the motion (Docket No. 776) of lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School for class certification pursuant to Federal Rule of Civil Procedure 23 is GRANTED as modified herein,

SO ORDERED.

9. Although Germany is a member of the European Union and signatory to the Lugano Convention, other courts in this District have determined that it is not more likely than not that German courts would enforce a class action judgment. *See Vivendi*, 242 F.R.D. at 103–05; *Borochoff v. Glaxosmithkline PLC*, 246 F.R.D. 201 (S.D.N.Y.2007). The Court is persuaded by the findings and reasoning in those cases and will apply them here.